689 A.2d 173

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JOSEPH BAUMAN, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 22, 1997—Decided February 27, 1997.

Before Judges MICHELS, KLEINER, and COBURN.

*Susan L. Reisner*, Public Defender, attorney for appellant (*Mark S. Carter*, Designated Counsel, of counsel and on the brief).

*Jeffrey S. Blitz,* Atlantic County Prosecutor, attorney for respondent (*James F. Smith,* Assistant County Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

Defendant Joseph Bauman appeals from his conviction on numerous counts of a superseding indictment returned by the Atlantic County Grand Jury and from his sentence to an aggregate prison term of twenty-three years with a ten-year period of parole ineligibility.

The criminal charges relate to a series of acts occurring on October 6, 7, and 8, 1992. At defendant's trial, he readily acknowledged his guilt of the crimes charged, and offered no specific evidence to rebut the State's proofs other than evidence that he contends supports his defense of intoxication or, alternatively, diminished capacity.

Defendant contends that the trial judge erred in: (1) failing to instruct the jury, *sua sponte,* on the defenses of intoxication and diminished capacity; (2) denying his motion to dismiss the superseding indictment and to reinstate the original indictment; (3) denying his motion for a new trial based on prosecutorial misconduct; and (4) denying his motion for a judgment of acquittal on one of his second-degree armed burglary convictions. Defendant also maintains that the judge abused his discretion by imposing an extended term on his third-degree conviction of aggravated assault while eluding a police officer and by imposing consecutive sentences for his conviction of third-degree aggravated assault of a police officer and on one of his second-degree armed burglary convictions.

We conclude that defendant's contentions, though requiring substantial discussion, are without merit. We therefore affirm.

I

It is not necessary to describe each of the many crimes that defendant committed. A short review of the sequence of events will suffice. Defendant, a New York resident, stole a 1984 Volvo with New York license plates, from an auto body repair shop on Long Island, New York. Defendant drove to the Trump Plaza Hotel in Atlantic City and parked in its parking garage. Defendant proceeded to the casino floor and gambled at the blackjack tables. At one point, defendant was winning approximately $4,000. Defendant continued to gamble and thereafter lost the entire $4,000 and any remaining money that he had brought with him from New York.

Defendant then left the casino floor, returned to the Trump Plaza parking garage, and slept in the Volvo. The next day, October 7, he broke into numerous automobiles parked in the garage and belonging to casino patrons and employees. Personal property was removed from many of those automobiles. Defendant then left the Trump Plaza and made his way up the Boardwalk to another casino-hotel, the Taj Mahal. He entered the Taj Mahal parking garage, broke into numerous automobiles, and removed valuable personal property. Defendant, carrying these stolen items, then returned to the Trump Plaza. On two occasions, defendant had contact with Officer Jones of the Atlantic City Police Department.

Among the many items that defendant stole were two registered handguns and two registered rifles removed from two different vehicles. From the proof it is clear that defendant possessed these weapons when he thereafter entered other parked motor vehicles. Additionally, defendant took a suitcase in which he found Valium, which had been prescribed for the owner of the suitcase.

Victims of defendant's crimes started reporting the thefts to the casino security officers and the police. Defendant's activities were also reported by a casino employee who spotted defendant breaking into a car.

The next morning, October 8, 1992, Officer Jones witnessed defendant acting strangely. As a result, defendant's description was reported to the Atlantic City Police Department.[1] Defendant took New Jersey license plates off of an automobile parked at a nearby casino training school and placed those plates on the Volvo. He then proceeded to depart Atlantic City.

## A.

Shortly before noon on October 8, 1992, Officers Harold Cooper and Thomas McGowan were on bicycle patrol at the intersection of Arkansas and Atlantic Avenues, about one-and-a-half blocks from the Trump Plaza, when they received a radio transmission to be on the lookout for a white Volvo with New York license plates loaded with stolen property. The officers spotted a Volvo traveling from the direction of the Trump Plaza. The officers pedalled up to the Volvo, which was stopped in traffic, and ordered defendant to pull his vehicle over. Defendant, who appeared very calm, looked at the officers and drove away at a high rate of speed. The officers broadcasted a description of the vehicle and its direction of travel—towards the Atlantic City Expressway—over the radio.

At 12:08 p.m., Officer Cohen, who was in uniform in a marked police unit, heard the alert and observed a white Volvo heading out of Atlantic City on the expressway at a normal rate of speed. Cohen activated his unit's overhead lights, pulled defendant over to the side of the road, and after exiting his vehicle with his weapon drawn, ordered defendant, who looked "a little panicky," to turn off his motor, drop the car keys out the window, and place his hands on the steering wheel. Defendant did not comply but, instead, drove away at a high rate of speed. Cohen pursued defendant's vehicle and broadcasted his pursuit over the police radio.

---

[1] Unless otherwise identified, all officers referred to in this opinion were members of the Atlantic City Police Department on October 8, 1992.

Detective Hurley, then traveling on the expressway, heard Cohen's alert. Hurley looked in his rear view mirror and saw the Volvo traveling on the shoulder of the road at about forty miles per hour. Hurley attempted to change lanes in order to avoid the oncoming Volvo, as the shoulder of the road was becoming narrower. Hurley's car stalled and was struck in the rear by defendant's vehicle, rendering Hurley unconscious and causing other disabling injuries. Meanwhile, Cohen, who was still in pursuit, observed defendant exit his vehicle wearing black pants, a white shirt, work gloves, and a bandanna. Cohen watched defendant run across the expressway and enter an adjacent marshy area filled with tall weeds and a creek. Cohen lost sight of defendant and called for backup assistance and the canine patrol.

At approximately 1:30 p.m., a canine patrol officer found defendant laying in the mud, naked, and concealed under marsh grass. The officer instructed defendant, who appeared calm, to raise his hands and lock them on top of his head. When defendant failed to comply, after several repeated commands, and instead made a movement with his right hand, the officer ordered his dog to apprehend defendant. The dog grabbed defendant with his teeth. Defendant was then taken into custody by several other officers. Defendant's clothing was found underneath his hiding place.

Officer McGowan, who observed defendant as he was taken into custody, described him as looking "a little weird." According to McGowan, defendant was able to stand and walk.

State Trooper David Timko, however, claimed that defendant was unable to stand or walk without support. According to Timko, defendant staggered, appeared off balance, grasped for support, and fell to the ground on his hands and knees. Defendant, according to Timko, spoke in a loud and boisterous manner, rambled at times, cried, and appeared very excited and nervous. His eyes were watery and bloodshot. Although Timko did not smell alcohol on defendant's breath, he believed that defendant was under the influence of some type of intoxicant. Consequently, Timko charged defendant with driving under the influence.

Defendant was transported to the Atlantic City Medical Center's emergency department at about 3:00 p.m., where he received treatment for cuts and abrasions, and a sample of his blood was obtained. State Police laboratory tests disclosed that there was no alcohol in defendant's blood. A drug test indicated that defendant had taken an undetermined amount of the tranquilizer Diazepam, commonly known as Valium.

Thereafter, defendant was transported to police headquarters by Officer Janes. En route, defendant managed to slip out of one of his handcuffs. Upon their arrival at headquarters, Janes exited the police vehicle and opened the rear door. As he attempted to assist defendant out of the vehicle, defendant pushed Janes, causing him to fall to the ground, as defendant escaped. Defendant ran down an alley and Janes radioed for help.

At about 4:20 p.m., Officer Bruno, in uniform in a marked police vehicle, saw defendant running between two houses. Since Bruno had heard the radio broadcast about defendant's escape, he yelled at defendant to stop. Defendant ignored this command and continued to run. Bruno exited his car and ran after defendant. As Bruno approached, defendant turned around and swung the handcuff that was still attached to his hand, hitting Bruno in the head and hand. Bruno tackled defendant to the ground and struggled with him for about one minute until other officers arrived, who helped Bruno handcuff defendant. Bruno injured his knee during the struggle, necessitating surgery. Defendant was then transported to police headquarters after he was apprehended.

This series of events was the focus of the initial indictment by the Atlantic County Grand Jury.[2]

---

[2] On March 24, 1993, the Atlantic County Grand Jury returned Indictment No. 93–03–0758–A, which charged defendant with third-degree theft by receiving stolen property, *N.J.S.A.* 2C:20–7, (counts one, thirteen, fourteen, fifteen, sixteen, eighteen, nineteen, twenty, and twenty-one); second-degree aggravated assault, *N.J.S.A.* 2C:12–1b(1), (count two); third-degree aggravated assault, *N.J.S.A.* 2C:12–1b(2), (count three); fourth-degree aggravated assault, *N.J.S.A.* 2C:12–

After failing to reach a plea bargain agreement, the prosecutor obtained a superseding indictment, No. 93–11–2816–A, which charged defendant as follows: third-degree theft by receiving stolen property, *N.J.S.A.* 2C:20–7, (count one); second-degree aggravated assault, *N.J.S.A.* 2C:12–1b(1), (count two); first-degree robbery, *N.J.S.A.* 2C:15–1, (count three); third-degree aggravated assault, *N.J.S.A.* 2C:12–1b(2), (count four); fourth-degree aggravated assault, *N.J.S.A.* 2C:12–1b(3), (count five); third-degree aggravated assault of a police officer, *N.J.S.A.* 2C:12–1b(5)(a), (counts six, eight, and nine); third-degree aggravated assault while eluding a police officer, *N.J.S.A.* 2C:12–1b(7), (count seven); fourth-degree eluding a police officer, *N.J.S.A.* 2C:29–2b (count ten); fourth-degree resisting arrest, *N.J.S.A.* 2C:29–2a(1), (counts eleven and twelve); fourth-degree resisting arrest, *N.J.S.A.* 2C:29–2a(2), (count thirteen); third-degree burglary, *N.J.S.A.* 2C:18–2, (counts fourteen, sixteen, eighteen, and twenty); fourth-degree theft of moveable property, *N.J.S.A.* 2C:20–3a, (count fifteen); third-degree theft of moveable property, *N.J.S.A.* 2C:20–3a, (counts seventeen, nineteen, twenty-one, twenty-three, twenty-four, twenty-five, twenty-seven, and twenty-eight); second-degree armed burglary, *N.J.S.A.* 2C:18–2, (counts twenty-two and twenty-six); fourth-degree credit card theft, *N.J.S.A.* 2C:21–6c(1), (counts twenty-nine and thirty); third-degree unlawful possession of a rifle, *N.J.S.A.* 2C:39–5c(1) (counts thirty-one and thirty-two); third-degree possession of a handgun without a permit, *N.J.S.A.* 2C:39–5b (counts thirty-three and thirty-four); third-degree es-

---

1b(3), (count four); third-degree aggravated assault of a police officer, *N.J.S.A.* 2C:12–1b(5)(a), (counts five, six, and seven); fourth-degree eluding a police officer, *N.J.S.A.* 2C:29–2b, (count eight); fourth-degree resisting arrest, *N.J.S.A.* 2C:29–2a(1), (counts nine and ten); fourth-degree resisting arrest, *N.J.S.A.* 2C:29–2a(2), (count eleven); fourth-degree theft by receiving stolen property, *N.J.S.A.* 2C:20–7, (counts twelve and seventeen); fourth-degree credit card theft, *N.J.S.A.* 2C:21–6c(1), (counts twenty-two and twenty-three); second-degree possession of a weapon by a convicted person, *N.J.S.A.* 2C:39–7b, (counts twenty-four, twenty-five, twenty-seven, and twenty-nine); third-degree aggravated assault while eluding a police officer, *N.J.S.A.* 2C:12–1b(7), (count twenty-six), and third-degree escape, *N.J.S.A.* 2C:29–5a, (count twenty-eight).

cape, *N.J.S.A.* 2C:29–5a, (count thirty-five), and second-degree possession of a weapon by a convicted felon, *N.J.S.A.* 2C:39–7b, (counts thirty-six, thirty-seven, thirty-eight, and thirty-nine).

Prior to trial, defendant unsuccessfully moved to dismiss the superseding indictment and to reinstate the original indictment. Defendant contended that the superseding indictment was obtained because of prosecutorial vindictiveness arising from defendant's refusal to accept the prosecutor's plea offer. Prosecutorial vindictiveness, discussed in Part III, is a concept that has received limited attention in prior opinions of this court.

Also before trial, the State moved to dismiss counts three, sixteen, and seventeen of the superseding indictment and obtained an order of severance on counts thirty-six through thirty-nine.[3]

During the trial, the trial judge dismissed count six at the conclusion of the State's case. The jury acquitted defendant on counts two, four, and eight but found defendant guilty on all other remaining counts.

### B.

In his defense, defendant contended that he had little or no recollection of the events preceding his apprehension and attributed his lack of memory to either intoxication or diminished capacity. Defendant detailed his prior life's story. He acknowledged that he had three prior convictions for third-degree crimes, two in 1981 and one in 1984.

In 1983, defendant was diagnosed as having a schizoaffective disorder, severe depression, and a substance abuse problem. Defendant was hospitalized at the Mid–Hudson Psychiatric Center on three occasions between June 1983 and May 1984.

Following his discharge in May 1984, defendant earned an associates degree in business administration, a bachelor's degree

---

[3] Counts thirty-six through thirty-nine were dismissed on the State's motion at the time of defendant's sentencing.

in human behavior, and started earning credits towards a Masters Degree in social work. During this period, defendant was employed in a variety of positions. Defendant was, for a while, an admitting clerk and patient representative at St. Claire's Hospital; he later worked at Montefiore Medical Center as assistant director of patient relations. In December 1990, defendant began employment with the New York Board of Education as a substance abuse prevention specialist, counseling students who were at risk of becoming involved with drugs. While working for the Board of Education, defendant also taught behavioral courses as an adjunct professor for Mercy College.

Following his discharge from the hospital in May 1984, defendant became actively involved with Alcoholic Anonymous and Narcotics Anonymous, acknowledging that he was an alcoholic and a drug addict. Defendant testified he was doing well with his recovery but fell from the sobriety wagon in November 1991, when he drank a six-pack of beer following an argument with his wife about their finances. In March 1992, defendant began using crack cocaine. Although defendant's usage was initially sporadic, by September 1992, he was consuming several grams a day. Defendant depleted his family savings and became overdrawn on all of his credit cards.

Defendant informed his supervisor at the Board of Education that he had an addiction problem and requested a thirty-day leave of absence in order to enter a residential treatment program. Defendant's request was denied and he was asked to resign. Although he tried to gain admission to a detoxification program, defendant's name was placed on a waiting list.

Defendant, who had been living with his wife and daughter in a house that they owned on Long Island, left home on September 16, 1992. Defendant took some clothing and lived in his van for several days. He used crack cocaine several times a day during this period. Defendant eventually spent a few days at the home of a friend in Port Chester, New York. While there, defendant testified he was arrested for a motor vehicle infraction and was

handcuffed by the Port Chester police; however, he escaped, and friends removed his handcuffs with a bolt cutter.

Defendant returned home and obtained some clothing and a Trump Plaza courtesy card that bore his name. Defendant then stole the Volvo and drove to Atlantic City.

Defendant further testified that while playing blackjack on the evening of his arrival in Atlantic City, he was hearing imaginary voices. He slept that night in his automobile. When he awoke, he began to experience visual and auditory hallucinations, which he had not experienced since 1984. He claimed that he saw silhouettes of imaginary people sitting in vehicles that were parked in the Trump Plaza garage. These individuals mocked him and told him that he was a failure. Consequently, defendant exited the Volvo and approached the vehicles in which these imaginary individuals were seated in order to confront his tormentors. Defendant claimed that he asked these imaginary persons to leave him alone and that they laughed at him and made derogatory remarks. In response, defendant entered the vehicles and took "trophies" as a way of stopping the hallucinations. Defendant acknowledged that he entered some of the vehicles by breaking the windows with a gloved fist. Other cars that he entered were unlocked. Defendant placed the items that he obtained from these vehicles into the Volvo. Defendant then proceeded to the Taj Mahal where he also entered automobiles and removed property found in those vehicles. He carried the items in two suitcases to the Trump Plaza parking garage. Defendant denied that he took the items for monetary reasons.

The remainder of defendant's testimony focused on his attempt to elude the police, his initial apprehension, his escape into the swamp, and his ultimate apprehension. He claimed that he did not realize that he was doing anything wrong when he entered the automobiles and removed personal property. He did, however, realize that his actions were illegal when he was approached by the bicycle patrolmen, and he began to elude the police, although denying any specific recollection of those events. Although he

denied using cocaine on October 7 or 8, 1992, he did admit that he consumed two or three Valium tablets that had been taken from one of the parked automobiles.

## C.

As part of his defense, defendant presented two board certified psychiatrists, Dr. Frederick Erskine and Dr. Kenneth Weiss. The testimony of each deserves recounting.

Erskine testified that defendant has antisocial tendencies as manifested from his high school days when he began to use drugs. Defendant was diagnosed as psychotic with a schizoaffective disorder and hallucinations during his 1983–1984 hospitalizations. People with this disorder typically have manic-depression, schizophrenic reactions, delusions, hallucinations, disordered thinking, bad judgment, impulsiveness and distract-ability. Defendant, however, was in remission following his discharge from the hospital until November 1991, when he began a downward spiral. Defendant entered the manic phase of a manic-depressive reaction, and he began exercising bad judgment and acting impulsively.

Erskine opined that defendant was psychotic due to his schizoaffective disorder, delusional, in a manic episode, and not thinking in a straightforward manner at the time he broke into the vehicles. Although defendant's cognitive capacity was fairly intact and he had the ability to perform purposeful, goal-directed activities and to understand the nature and quality of his acts, defendant was unable at the time to understand that what he was doing was wrong. Defendant's ability to determine right from wrong was diminished. Defendant's reasoning and knowing capacities were not impaired, but his judgmental capacity was very impaired. He acted impulsively in order to obtain items that he could fence in exchange for money for gambling. Erskine also opined that defendant was in a psychotic state when he was being chased by the police as evidenced by his auditory hallucinations. He did, however, act in a purposeful and knowing manner at that time.

Weiss opined that on October 7 and 8, 1992, defendant was suffering from a mental disease state in the form of cocaine abuse and dependence. In addition, defendant had secondary diagnoses which were caused by his cocaine problem, i.e., organic hallucinosis which was manifested by hearing voices and seeing things that were not there and organic delusional syndrome which was manifested by believing things that were not true. Although defendant understood the nature and quality of his acts on October 7 and 8, 1992, he suffered from a defective reason and his mental disease state prevented him from knowing that what he was doing was wrong.

In rebuttal, the State presented the expert testimony of Dr. Daniel Greenfield, who is board certified in psychiatry and addiction medicine. Greenfield concluded that although defendant had a chronic schizoaffective disorder, it was in remission at the time of the instant crimes. He explained that people suffering from schizoaffective disorder can distinguish right from wrong. In his opinion, defendant was sane at the time that he committed the criminal acts since he knew the nature and quality of his acts and was able to distinguish right from wrong. Defendant's conduct consisted of complex, goal-directed, knowing and purposeful acts that required memory of the recent past, awareness of the present, and an ability to anticipate future consequences and events. Defendant fled from the police because he knew he was in trouble and knew that what he had done was wrong. Any delusions or auditory and visual hallucinations that defendant may have experienced as a result of his schizoaffective disorder were not powerful enough to have overcome his knowing, purposeful and goal-directed behavior.

## D.

Prior to sentencing defendant moved for a new trial on the grounds that: (1) the verdict was against the weight of the evidence; and (2) that the prosecutor made improper remarks during his summation. Both motions were denied.

Thereafter, defendant was sentenced. After merging defendant's conviction on count five into his conviction on count seven, the judge granted the State's motion for an extended term on count seven since defendant was a persistent offender. The court imposed a nine-year prison term with a four-year parole ineligibility period on count seven; a consecutive five-year term, with a two-year parole ineligibility period on count nine; and a consecutive nine-year term, with a four-year parole ineligibility period on count twenty-two. Concurrent eighteen-month terms were imposed on counts ten, eleven, twelve, thirteen, fifteen, twenty-nine, and thirty. A concurrent nine-year term, with a four-year parole ineligibility period was imposed on count twenty-six. Concurrent five-year terms were imposed on counts one, fourteen, eighteen, nineteen, twenty, twenty-one, twenty-three, twenty-four, twenty-five, twenty-seven, twenty-eight, thirty-one, thirty-two, thirty-three, thirty-four and thirty-five. Thus, defendant's aggregate sentence is a twenty-three year prison term with a ten-year period of parole ineligibility. In addition, defendant was fined $1,450 for the Violent Crimes Compensation Board.

On appeal, defendant raises six points of error:

POINT I

DEFENDANT'S CONVICTIONS MUST BE REVERSED AS THE TRIAL COURT FAILED TO CHARGE THE JURY ON THE ISSUES OF INTOXICATION AND DIMINISHED CAPACITY. [Point Not Raised Below.]

POINT II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION TO DISMISSING [sic] THE SUPERSEDING INDICTMENT NO. 93-11-2816-A AND PROCEEDING ONLY UNDER INDICTMENT NO. 93-03-0758-A BECAUSE THERE WAS NOTHING SUBSTANTIALLY NEW ADDED FROM THE ORIGINAL INDICTMENT TO THE SUPERSEDING INDICTMENT.

POINT III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BECAUSE THE PROSECUTOR'S SUMMATION TO THE JURY WAS IMPROPER AND DENIED THE DEFENDANT A FAIR TRIAL.

POINT IV

DEFENDANT'S CONVICTION ON COUNT TWENTY-TWO FOR ARMED BURGLARY MUST BE REVERSED AS THE STATE FAILED TO PROVE

BEYOND A REASONABLE DOUBT THAT THE DEFENDANT WAS ARMED AT THE TIME OF THE BURGLARY. (Not Raised Below).

*POINT V*

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING THE STATE'S MOTION FOR AN EXTENDED TERM PURSUANT TO *N.J.S.A.* 2C:44–3a.

*POINT VI*

THE TRIAL COURT COMMITTED ERROR IN IMPOSING CONSECUTIVE SENTENCES RATHER THAN CONCURRENT SENTENCES BECAUSE THE OFFENSES COMMITTED WERE ESSENTIALLY AT THE SAME TIME.

In a *pro se* supplemental brief, defendant raises one point of error, which alleges:

*POINT I*

THE PROSECUTOR'S CONDUCT DENIED DEFENDANT OF FAIR AND FUNDAMENTAL TREATMENT BY IMPROPER PROSECUTORIAL COMMENTS MADE DURING SUMMATION, IN VIOLATION OF THE UNITED STATES CONSTITUTION.[4]

As noted, defendant's allegations of error require some discussion, yet we find those allegations without merit.

## II

Defendant contends for the first time on appeal that the judge erred in failing to instruct the jury on the defense of intoxication, as per *N.J.S.A.* 2C:2–8, and that the judge erred by failing to charge the jury on the defense of diminished capacity, as per *N.J.S.A.* 2C:4–2.

Since defense counsel did not request a charge on intoxication or diminished capacity and did not object to their omission from the jury instructions, defendant can only prevail if he demonstrates plain error, i.e., error "clearly capable of producing an unjust result." *R.* 2:10–2. After a thorough review of the record, we are satisfied that defendant's contentions are without merit. *R.* 2:11–3(e)(2). We add the following comments.

---

[4] This point of error supplements defense counsel's brief articulated in Point Three.

### A.

"The defense of intoxication is divided between 'voluntary' and 'involuntary' intoxication," *State v. Sette*, 259 *N.J.Super.* 156, 170, 611 *A.*2d 1129 (App.Div.), *certif. denied*, 130 *N.J.* 597, 617 *A.*2d 1219 (1992), and may be attributed to drugs or alcohol. *State v. Zola*, 112 *N.J.* 384, 424, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). Involuntary intoxication is intoxication that is either not self-induced or is pathological. Involuntary intoxication is a complete defense if the level of intoxication is so high that the defendant is not aware of the nature and quality of his acts or is not aware that those acts are wrong. *Sette, supra,* 259 *N.J.Super.* at 170, 611 *A.*2d 1129; *N.J.S.A.* 2C:2–8d. When the evidence and the legitimate inferences to be drawn therefrom are viewed in the light most favorable to defendant, it is clear that there was no rational basis to support a charge on involuntary intoxication.

The other form of intoxication, "voluntary" or "self-induced," "is not a defense unless it negatives an element of the offense." *N.J.S.A.* 2C:2–8a; *State v. Cameron*, 104 *N.J.* 42, 51, 514 *A.*2d 1302 (1986). In order to negate an element of the offense, the intoxication must be of an "extremely high level." *Id.* at 54, 514 *A.*2d 1302; *Sette, supra,* 259 *N.J.Super.* at 170, 611 *A.*2d 1129. A jury charge on voluntary intoxication is required only if there exists a "rational basis for the conclusion that defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming" the requisite intent. *State v. Mauricio*, 117 *N.J.* 402, 418–19, 568 *A.*2d 879 (1990). The determination of a particular defendant's intoxication is fact specific. Many cases have analyzed the defendant's consumption of intoxicants and found it to be sufficient to warrant a jury charge on intoxication. *See, e.g., State v. Bey (II)*, 112 *N.J.* 123, 143–45, 548 *A.*2d 887 (1988) (holding that defendant's intoxication warranted a jury charge where defendant consumed 120 ounces of malt liquor, some straight rum and smoked a considerable quantity of marijuana during the four-and-one-half hour period before the crime and had only partial recall

about the details of the offense), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *see also State v. Warren,* 104 *N.J.* 571, 573–74, 578, 518 *A.*2d 218 (1986); *State v. Frankland,* 51 *N.J.* 221, 222–23, 238 *A.*2d 680 (1968); *State v. Polk,* 164 *N.J.Super.* 457, 460–63, 397 *A.*2d 330 (App.Div.1977), *aff'd o.b.,* 78 *N.J.* 539, 397 *A.*2d 327 (1979).

Other courts have found that a defendant's actions were sufficiently coherent that a jury charge was not warranted. *See, e.g., Mauricio, supra,* 117 *N.J.* at 419–20, 568 *A.*2d 879 (finding insufficient evidence to require a jury charge where bouncer refused defendant admission to nightclub in the belief that he had already had enough to drink, and witnesses testified that defendant was "drunk," "intoxicated," and "high," but where, during the hour preceding the crime, defendant was able to count, walk, climb stairs, change his clothes, and stand up after being wrestled down a flight of stairs, and defendant managed to elude detection by the police who arrived shortly after the shooting); *see also Zola, supra,* 112 *N.J.* at 423–25, 548 *A.*2d 1022; *Cameron, supra,* 104 *N.J.* at 56–57, 514 *A.*2d 1302; *State v. Micheliche,* 220 *N.J.Super.* 532, 542–43, 533 *A.*2d 41 (App.Div.), *certif. denied,* 109 *N.J.* 40 (1987).

■ Viewing the evidence and the legitimate inferences to be drawn therefrom in the light most favorable to defendant, it is clear that a jury charge on voluntary intoxication was not required. Although defendant claimed that he used several grams of cocaine each day during the weeks preceding the instant crimes, defendant testified that he did not consume any cocaine on the dates that the crimes were committed. Rather, he merely consumed two or three Valium tablets that he had stolen from one of the burglarized vehicles. Defendant's testimony was confirmed by blood tests taken at the hospital on the afternoon of his arrest. These tests disclosed that there was no alcohol in defendant's blood and confirmed that the only drug present in defendant's bloodstream was Valium. Moreover, defendant's testimony disclosed that he was able to recall significant events surrounding the

crimes. The only incident that defendant claimed not to remember was when he was stopped by the bicycle patrol officers.

The only evidence of possible intoxication was Trooper Timko's testimony that when defendant was arrested in the marshy area he was unable to stand or walk without support. According to Timko, defendant spoke in a loud and boisterous manner and rambled at times. Although Timko did not smell any alcohol on defendant's breath, he noticed that defendant's eyes were watery and bloodshot, and he felt that defendant was under the influence of an intoxicant. Timko's testimony, however, was contradicted by Officer McGowan who also observed defendant as he was taken into custody. According to McGowan, defendant was able to stand and walk. Additionally, Officer Jones, who had observed and spoken with defendant earlier that morning in the Trump Plaza, claimed that defendant did not stagger or sway while carrying suitcases out of the Trump Plaza parking garage.

Moreover, defendant's behavior indicated that he had not suffered a prostration of faculties. Defendant was able to burglarize several vehicles, transfer items from the burglarized vehicles into the Volvo, steal license plates and place them on the Volvo, walk while carrying two suitcases through the Trump Plaza garage, engage in a high speed chase while being pursued by police officers, run into a marshy area and escape detection for several hours, slip out of one of his handcuffs and escape from a police vehicle, and run "full speed" while being pursued by Officer Bruno.

Most importantly, voluntary intoxication was not a defense in this case since it did not negate the purposeful or knowing mental states required for the commission of the crimes with which defendant was charged. *Cameron, supra,* 104 *N.J.* at 51–52, 514 *A.*2d 1302. Dr. Erskine admitted that defendant was able to perform purposeful activities on the dates of the crimes and that his knowing capacity was not impaired.

Since the evidence did not provide a rational basis from which the jury could conclude that defendant's faculties were so prostrat-

ed that he was incapable of forming the requisite intent, no error was committed by the failure to charge the defense of voluntary intoxication.

### B.

The defense of diminished capacity is set forth in *N.J.S.A.* 2C:4–2, which provides:

> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.
>
> [*Ibid.*]

All mental deficiencies and "disorders," where there is evidence of an underlying mental defect or disease, including conditions that cause a loss of emotional control, may support a diminished capacity defense. *See State v. Reyes* 140 *N.J.* 344, 364, 658 *A.2d* 1218 (1995). A jury instruction is warranted if the record shows that:

> [E]xperts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive faculties, and the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime.
>
> [*State v. Galloway,* 133 *N.J.* 631, 647, 628 *A.2d* 735 (1993).]

Here, defendant's expert, Dr. Erskine, opined that defendant was psychotic, delusional, and in a manic episode due to his schizoaffective disorder when he broke into the vehicles and when he was being chased by the police. Erskine, however, stated that defendant's cognitive capacity was fairly intact and that he acted in a purposeful and knowing manner at the times in question. Erskine explained that although defendant was unable to understand that what he was doing was wrong, he understood the nature and quality of his acts.

Defendant's other expert, Dr. Weiss, opined that defendant was suffering from a mental disease state in the form of cocaine abuse and dependence at the time of the crimes. In addition, defendant's cocaine problem caused him to have organic hallucinosis

and organic delusional syndrome. Weiss, however, opined that defendant understood the nature and quality of his acts on the dates in question and that his mental disease state merely prevented him from knowing that what he was doing was wrong.

On the other hand, the State's expert, Dr. Greenfield, opined that defendant had a chronic schizoaffective disorder which was in remission at the time of the instant crimes. Defendant acted in a knowing and purposeful manner, knew the nature and quality of his acts, and was able to distinguish right from wrong.

Thus, none of the expert witnesses testified that defendant's mental disease impaired his ability to form the requisite mental states of purpose, knowledge, and recklessness, which are elements of the offenses with which he was charged. A diminished capacity charge was not required by the mere fact that the defense experts thought that defendant did not know that what he was doing was wrong at the time of the offenses, since they agreed that he knew the nature and quality of his acts. As explained by Judge Baime:

> Obviously, one who, by virtue of a mental disease or defect, does not know the "nature and quality" of his act may well be so incapacitated as to be unable to form the requisite mental state to be guilty of an offense. In that event, both the defenses of diminished capacity and insanity are available. On the other hand, there are undoubtedly cases in which the offender has the capacity to harbor the requisite mental state, but is sufficiently impaired so as not to be able to understand that what he is doing is wrong.
>
> [*State v. Humanik*, 199 *N.J.Super.* 283, 299 n. 6, 489 *A*.2d 691 (App.Div.), *certif. denied*, 101 *N.J.* 266, 501 *A*.2d 934 (1985), *cert. denied*, 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed*.2d 25 (1989), *aff'd in part, rev'd in part sub nom. Humanik v. Beyer*, 871 *F*.2d 432 (3rd Cir.), *cert. den.*, 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed*.2d 25 (1989).]

Defendant in the case at bar only attempted to demonstrate that he did not know right from wrong. His own experts admitted that defendant knew the nature and quality of his acts and Dr. Erskine acknowledged that defendant had the capacity to act knowingly and purposely at the time of the offenses.

A review of the evidence and the legitimate inferences to be drawn therefrom in the light most favorable to defendant as required by our Supreme Court, *Galloway, supra,* 133 *N.J.* at 648,

628 *A.*2d 735; *State v. Moore,* 113 *N.J.* 239, 287, 550 *A.*2d 117 (1988), reveals that defendant failed to make the required showing that his alleged mental disease related to his ability to form the requisite criminal mental states that are elements of the offenses with which he was charged. Nor did defendant show that this mental disease is generally accepted within the scientific community to be capable of impairing one's ability to possess the states of mind required for the offenses with which he was charged. Thus, the judge's failure, *sua sponte,* to submit the defense of diminished capacity to the jury was not error.

### III

Defendant contends that the judge erred in denying his motion to dismiss the superseding indictment and reinstate the original indictment. Specifically, defendant argues that the additional charges contained in the superseding indictment violated his right to due process because the prosecutor acted vindictively in obtaining the superseding indictment after defendant failed to enter into a plea bargain.

As noted, *supra,* the original indictment, No. 93–03–0758–A, which was returned on March 24, 1993, contained twenty-nine counts. During the course of pretrial conference negotiations, the State made two separate plea offers to defendant, neither of which were accepted. Thereafter, on November 1, 1993, the prosecutor presented a superseding indictment to the grand jury. The transcript of the grand jury proceeding held on that date reveals that no new evidence was presented. Rather, the assistant prosecutor merely read into the record the testimony of the sole witness, Detective William Curtis, who testified at the original grand jury proceeding on March 24, 1993. As a result, superseding Indictment No. 93–11–2816–A was returned on November 1, 1993, which contained thirty-nine counts.

The superseding indictment contained eleven new counts that

were not in the original indictment [5]—one count of first-degree robbery (count three),[6] two counts of second-degree burglary (counts twenty-two and twenty-six), four counts of third-degree burglary (counts fourteen, sixteen, eighteen and twenty), two counts of third-degree unlawful possession of a rifle (counts thirty-one and thirty-two) and two counts of third-degree possession of a handgun without a permit (counts thirty-three and thirty-four). In addition, the superseding indictment replaced one count of fourth-degree receiving stolen property contained in the original indictment (count twelve) with one count of fourth-degree theft of moveable property (count fifteen), and replaced eight counts of third-degree receiving stolen property in the original indictment (counts thirteen, fourteen, fifteen, sixteen, eighteen, nineteen, twenty and twenty-one) with eight counts of third-degree theft of moveable property (counts seventeen, nineteen, twenty-one, twenty-three, twenty-four, twenty-five, twenty-seven and twenty-eight).

Defendant moved for an order dismissing the superseding indictment and for the reinstatement of the original indictment. In an accompanying certification, defense counsel argued that defendant's right to due process was violated because the State's motive in obtaining the superseding indictment was prosecutorial vindictiveness because defendant refused to accept the State's plea offers. In support of her argument, defense counsel pointed to the fact that no new evidence was discovered between the time of the original indictment and the superseding indictment to justify the additional charges.

During oral argument on the motion, defense counsel repeated the allegations contained in her certification. The prosecution was assigned to Chester Wiech, Jr., yet another assistant prosecutor,

---

[5] One count of fourth-degree receiving stolen property contained in the original indictment (count seventeen) was not included in the superseding indictment.

[6] The original indictment did not contain any first-degree crimes.

Joseph Constantini, appeared at oral argument on the motion. Constantini asserted that:

I know from speaking to Mr. Wiech that there were a number of plea negotiations between him and prior counsel in this case and that it was his intention that he had made it clear to those parties that he was going to supersede this Indictment ... the feeling was why supersede it if it can be worked out? If it could be worked out, there's no need to supersede it, but there came a point in time it became apparent that the Indictment would have to be superseded ... nevertheless as to the one count of the Indictment, which is a first degree count ... [w]e'll dismiss that today, Judge.

Constantini requested that the court dismiss the first-degree robbery charge because it had been obtained "through some misunderstanding."

The judge granted the State's motion to dismiss the first-degree robbery charge, but he refused to dismiss the remaining counts of the superseding indictment. The judge reasoned that since the evidence presented to the original grand jury was sufficient to indict defendant on the additional charges contained in the superseding indictment, it could only be inferred that these additional charges were omitted through inadvertence, and, therefore, the prosecutor's motive in obtaining the superseding indictment was not vindictive.

## A.

Defendant relies on *North Carolina v. Pearce*, 395 *U.S.* 711, 89 *S.Ct.* 2072, 23 *L.Ed.*2d 656 (1969) [7] and *Blackledge v. Perry*, 417 *U.S.* 21, 94 *S.Ct.* 2098, 40 *L.Ed.*2d 628 (1974), in support of his argument. In *Pearce, supra,* the Supreme Court examined whether a trial court can impose a more severe sentence upon retrial and reconviction after an accused has successfully challenged his first conviction on appeal. The Court held that, although a heavier sentence is not absolutely prohibited, due process requires that the reasons for imposing such a sentence

---

[7] *Simpson v. Rice*, 395 *U.S.* 711, 89 *S.Ct.* 2072, 23 *L. Ed.*2d 656 (1969), which was decided along with *North Carolina v. Pearce, supra,* was overruled by *Alabama v. Smith*, 490 *U.S.* 794, 109 *S.Ct.* 2201, 104 *L.Ed.*2d 865 (1989).

upon retrial must affirmatively appear and be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding so that an accused may be free, when taking an appeal, of any apprehension of subsequent retaliatory or vindictive sentencing because of his successful appeal. *Id.* at 726, 89 *S.Ct.* at 2080–81, 23 *L.Ed.*2d at 669–70. The Due Process Clause of the Fourteenth Amendment "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id.* at 725, 89 *S.Ct.* at 2080, 23 *L.Ed.*2d at 669.

The defendant in *Blackledge, supra,* was initially charged with a misdemeanor. He was convicted in an inferior court in North Carolina and given a six-month prison sentence. The defendant exercised his right under North Carolina law to a trial *de novo* in Superior Court by filing a notice of appeal. After the notice of appeal was filed but prior to the trial *de novo,* the prosecution obtained an indictment charging defendant with a felony for the same acts for which he had previously been charged with a misdemeanor. The net result was an increase of eleven months in defendant's sentence. *Id.* at 22–23, 23 n. 2, 94 *S.Ct.* at 2100, n. 2, 40 *L.Ed.*2d at 632 n. 2. The Supreme Court held that, when the circumstances "pose a realistic likelihood of 'vindictiveness' ... due process of law requires a rule analogous to that of the *Pearce* case." 417 *U.S.* at 27, 94 *S.Ct.* at 2102, 40 *L.Ed.*2d at 634. Thus, even though there was no evidence of vindictiveness in the record, the Court held that it was constitutionally impermissible for the prosecution to bring the more serious charge against defendant after he had exercised his statutory right to appeal. 417 *U.S.* at 28–29, 94 *S.Ct.* at 2103, 40 *L.Ed.*2d at 634–35.

In further support of his argument, defendant relies on *United States v. Ruesga–Martinez,* 534 *F.*2d 1367, 1369 (9th Cir.1976), wherein the court interpreted *Pearce* and *Blackledge* as establishing that "when the prosecution ... reindict[s] the accused because the accused has exercised some procedural right, the prosecution

bears a heavy burden of proving that any increase in the severity of the alleged charges was not motivated by a vindictive motive." *Ibid.*

Defendant, however, has ignored the Supreme Court's subsequent decision in *Bordenkircher v. Hayes*, 434 *U.S.* 357, 98 *S.Ct.* 663, 54 *L.Ed.*2d 604 (1978), in which the Court distinguished the pre-trial plea bargaining process from the situations involved in *Pearce* and *Blackledge*. The question addressed in *Bordenkircher* was "whether the Due Process Clause of the Fourteenth Amendment is violated when a state prosecutor carries out a threat made during plea negotiations to reindict the accused on more serious charges if he does not plead guilty to the offense with which he was originally charged." 434 *U.S.* at 358, 98 *S.Ct.* at 665, 54 *L.Ed.*2d at 607. The prosecutor in *Bordenkircher* possessed evidence justifying the more serious charge at the time of the original indictment. In answering this question in the negative, the Court distinguished *Pearce* and *Blackledge* by noting that

[I]n those cases the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation "very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which possess relatively equal bargaining power."

[*Id.* at 362, 98 *S.Ct.* at 667, 54 *L.Ed.*2d at 610 (quoting *Parker v. North Carolina*, 397 *U.S.* 790, 90 *S.Ct.* 1458, 25 *L.Ed.*2d 785 (* * * *)).]

The Court noted that "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Bordenkircher, supra*, 434 *U.S.* at 363, 98 *S.Ct.* at 668, 54 *L.Ed.*2d at 610–11. The Court further observed:

In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."

[*Id.* at 364, 98 *S.Ct.* at 668–69, 54 *L.Ed.*2d at 611 (quoting *Oyler v. Boles,* 368 *U.S.* 448, 456, 82 *S.Ct.* 501, 506, 7 *L.Ed.*2d 446 (1962) (footnote omitted)).]

The Court concluded by stating:

> We hold only that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment.

[*Bordenkircher, supra,* 434 *U.S.* at 365, 98 *S.Ct.* at 670, 54 *L.Ed.*2d at 612.]

Although the Court declined to apply a presumption of vindictiveness, it did not rule out the possibility that a defendant could establish a due process violation by proof of actual vindictiveness. *Ibid.*

More recently, in *United States v. Goodwin,* 457 *U.S.* 368, 369–71, 102 *S.Ct.* 2485, 2494, 73 *L.Ed.*2d 74, 78–79, the Supreme Court held that the *Pearce* presumption of vindictiveness is unwarranted where a prosecutor adds a felony charge before trial to a defendant's misdemeanor and petty offense charges after the defendant demands a jury trial on the misdemeanor and petty offense charges. In so ruling, the Court noted that *Pearce* and *Blackledge,* in which the presumption of vindictiveness had been applied, involved the defendant's exercise of a procedural right that caused a complete retrial after he had been tried and convicted. "The decisions in [these] cases reflect a recognition by the Court of the institutional bias inherent in the judicial system against the retrial of issues that have already been decided." *Goodwin, supra,* 457 *U.S.* at 374, 102 *S.Ct.* at 2490, 73 *L.Ed.*2d at 81. This bias might subconsciously motivate a vindictive prosecutorial or judicial response to a defendant's exercise of his right to obtain a retrial of a decided question. *Id.* at 374, 376–77, 102 *S.Ct.* at 2490–91, 73 *L.Ed.*2d at 81–83. The institutional bias against the retrial of a decided question was not applicable to the situation in *Goodwin.* 457 *U.S.* at 383, 102 *S.Ct.* at 2494, 73 *L.Ed.*2d at 87.

The Court explained that there was "good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting." *Id.* at 381, 102 *S.Ct.* at 2492, 73 *L.Ed.*2d at 85. The Court explained:

In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

[*Id.* at 381, 102 *S.Ct.* at 2492–93, 73 *L.Ed.*2d at 85.]

Thus, the Court held that "the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted." *Id.* at 381, 102 *S.Ct.* at 2493, 73 *L.Ed.*2d at 86. The Court observed:

A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in Bordenkircher, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

[*Id.* at 382, 102 *S.Ct.* at 2493, 73 *L.Ed.*2d at 86 (footnotes omitted).]

Although the Court declined to apply a presumption of vindictiveness, it did not foreclose the possibility that a defendant might objectively prove actual vindictiveness. *Id.* at 384, 102 *S.Ct.* at 2494, 73 *L.Ed.*2d at 87. Where the presumption does not apply, as here, the defendant must affirmatively prove actual vindictiveness. *See Wasman, supra,* 468 *U.S.* at 569, 104 *S.Ct.* at 3223, 82 *L.Ed.*2d at 433; *see also State v. Long,* 119 *N.J.* 439, 465–67, 575 *A.*2d 435 (1990) (finding that defendant submitted no evidence of actual vindictiveness after refusing to apply a presumption of prosecutorial vindictiveness where the prosecutor submitted a superseding indictment that added four new charges and where those new charges did not significantly increase the potential punishment).

As noted, "the mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." *Goodwin, supra,* 457 *U.S.* at 382–83, 102 *S.Ct.* at 2493, 73 *L.Ed.*2d at 86. Defendant, therefore, must

affirmatively prove actual vindictiveness in order to prevail on appeal. Defendant has failed to do so.

The prosecutor's threat in *Bordenkircher, supra,* that he would reindict the defendant on more serious charges if he did not plead guilty was held not to establish actual vindictiveness. The prosecutor's actions in the case at bar did not constitute a threat since he merely told defense counsel that he intended to obtain a superseding indictment if plea negotiations proved fruitless. Thus, there is even less reason to think that the prosecutor's actions amounted to actual vindictiveness. Moreover, since the evidence supporting the additional charges in the superseding indictment was presented to the original grand jury, it can be inferred that the additional charges were omitted from the original indictment through inadvertence. Such inadvertence does not constitute actual vindictiveness. *See State v. Buckrham,* 173 *N.J.Super.* 87, 89–90, 413 *A.*2d 617 (App.Div.1980).

■ Additionally, the only significant charge that was added in the superseding indictment, the first-degree robbery charge, was dismissed prior to trial on the prosecutor's motion, presumably to remove any possible hint of prosecutorial vindictiveness. We find that: (1) no presumption of vindictiveness was warranted; (2) that there was no showing of actual vindictiveness; and (3) that, even if (1) or (2) were not the case, that the actions of the prosecutor in dismissing the only significant additional charge cured any error.

## IV

■ Defendant contends in Point III of his brief, as well as in the sole issue of his *pro se* supplemental brief, that the judge erred in denying his motion for a new trial because the prosecutor made several improper comments during summation that denied him the right to a fair trial.

Although defense counsel did not object during trial to any of the prosecutor's comments to which defendant now objects on appeal, she did move for a new trial on the ground that the

prosecutor made several improper remarks during summation. During oral argument on the motion, defense counsel asserted that the comments amounted to prosecutorial misconduct. The judge disagreed and denied the motion, finding that the prosecutor had not committed any impropriety during summation.

During summation, a prosecutor is generally limited to commenting on the evidence and to "drawing any reasonable inferences supported by the proofs." *State v. Zola*, 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L. Ed.*2d 205 (1989). A prosecutor may, however, make "a vigorous and forceful presentation of the State's case." *Ibid.* (quoting *State v. Bucanis*, 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied*, 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958)). Prosecutorial misconduct forms the basis for reversal only when the prosecutor's conduct was so egregious that it "deprived defendant of a fair trial." *Zola, supra,* 112 *N.J.* at 426, 548 *A.*2d 1022 (citing *State v. Ramseur*, 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987), *cert. denied*, 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993)). In order to warrant a reversal, a prosecutor's statements must "substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *State v. Koedatich,* 112 *N.J.* 225, 338, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989) (quoting *Bucanis, supra,* 26 *N.J.* at 56, 138 *A.*2d 739). A failure to make a timely objection to a prosecutor's remarks, shows that "in the atmosphere of the trial the defense did not believe that the prosecutor's remarks were prejudicial." *State v. Wilson,* 57 *N.J.* 39, 51, 269 *A.*2d 153 (1970). We recognize the general reluctance of counsel to object during a summation, yet recognize that an objection immediately following summation does permit curative action by the judge. Silence on the part of counsel and a subsequent motion for a new trial cannot be condoned.

We have analyzed the ten specific comments in the prosecutor's summation that defendant contends necessitate reversal. In our review, we are fully aware that the judge instructed the jury

immediately prior to the summations and again during his charge that if either attorney said anything about the evidence during summation that differed from the jurors' recollection, the jurors were bound by their own recollection since it was their exclusive function to decide the facts in the case. The judge also instructed the jury that they were to decide the case based on the evidence without bias, prejudice, or sympathy. "There can be no assumption that the jury did not faithfully follow this admonition." *State v. Darrian*, 255 *N.J.Super.* 435, 454, 605 *A.*2d 716 (App.Div.), *certif. denied*, 130 *N.J.* 13, 611 *A.*2d 651 (1992).

We need not review each of the ten alleged comments. We are satisfied that most of defendant's contentions are without merit. *R.* 2:11–3(e)(2). We add the following selected comments.

Some of the alleged improper remarks were clearly remarks on the credibility of defendant's testimony and are therefore unobjectionable. *See Darrian, supra,* 255 *N.J.Super.* at 458, 605 *A.*2d 716 (prosecutor's remarks during summation that defendant had lied during his testimony, as well as in his statement to the police, were not improper since they merely constituted comments upon the evidence and the credibility of defendant's testimony); *State v. Morris,* 242 *N.J.Super.* 532, 543, 577 *A.*2d 852 (App.Div.), *certif. denied,* 122 *N.J.* 408, 585 *A.*2d 405 (1990) (prosecutor did not overstep bounds of propriety in summation when she challenged defendant's claim that he intended to return to custody following escape by commenting that it was hard to believe that defendant escaped only to go to another prison; prosecutor's remark did nothing more than discuss facts in evidence); *State v. Robinson,* 157 *N.J.Super.* 118, 120, 384 *A.*2d 569 (App.Div.), *certif. denied,* 77 *N.J.* 484, 391 *A.*2d 498 (1978) (prosecutor's comments during summation that defendant's testimony appeared incredible, unbelievable and fabricated were not improper since they merely constituted comments on the credibility of defendant's testimony).

One of these criticisms is illustrative. Defendant contends that the following comment was improper:

> But [defendant] tells you he couldn't distinguish fantasy from reality at the time; but yet, he's able to come here nearly two years later and tell you all about the hallucinations and exactly when they started and when they stopped.
>
> Does that give some cause for concern? I submit, it should give you a great deal of cause for concern, because in doing that, in doing that [sic], I submit, it sheds light on the fact that *this whole thing was concocted.*
>
> [ (emphasis added).]

Defendant contends that the prosecutor's comment to the effect that the defense of insanity was "concocted" denigrated defendant and his defense and implied that defense counsel had engaged in improper conduct. "It is likewise improper for a prosecutor, without support in the evidence, to accuse a defendant of conspiring with his counsel to conceal and distort the truth." *State v. Setzer,* 268 *N.J.Super.* 553, 565, 634 *A.*2d 127 (App.Div. 1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994); *State v. Sherman,* 230 *N.J.Super.* 10, 19, 552 *A.*2d 621 (App.Div.1988). Here, the prosecutor's comment focused on defendant's testimony, rather than on any actions of defense counsel. Indeed, at a later point in his summation, the prosecutor stated: "I have a tremendous amount of respect for [defense counsel]. She's a fine attorney...." As noted, a prosecutor is allowed to comment on the credibility of a defendant's testimony during summation. Indeed, in *State v. DiPaglia,* 64 *N.J.* 288, 295–97, 315 *A.*2d 385 (1974), the Supreme Court found that the prosecutor's comments during summation that the defense of insanity was a carefully contrived fabrication to avoid defendant's criminal responsibility did not prejudice defendant's right to a fair trial since the prosecutor was simply attempting to meet the defense contention that defendant's criminal conduct was a manifestation of his insanity.

Even if the prosecutor's comment could be interpreted as referring to defense counsel, it was an isolated remark and certainly not so egregious that it deprived defendant of a fair trial. In light of the fact that defendant was acquitted by the jury on three counts, it cannot be concluded that this remark substantially prejudiced defendant's right to have the jury fairly evaluate his case.

Lastly, defendant characterizes the summation as an effort by the prosecutor to bolster the credibility of the State's witnesses, as mocking the defendant, or as denigrating the defendant's expert witnesses. We have thoroughly considered those contentions and find they lack merit.

We conclude the judge did not err in denying defendant's motion for a new trial since a new trial was not required "in the interest of justice." *R.* 3:20–1.

## V

Defendant contends in Point IV of his brief that his conviction of second-degree armed burglary of the Boyer vehicle (count twenty-two) must be reversed because the State failed to present sufficient evidence to enable a jury to find beyond a reasonable doubt that defendant was armed at the time of the burglary.[8] We disagree. Defendant's contention is without merit. *R.* 2:11–3(e)(2).

We merely note that the argument that defendant raises on appeal was addressed and disposed of in *State v. Merritt,* 247 *N.J.Super.* 425, 589 *A.*2d 648 (App.Div.), *certif. denied,* 126 *N.J.* 336, 598 *A.*2d 893 (1991).

## VI

Defendant contends in Point V of his brief that the judge abused his discretion by imposing an extended term on his third-degree conviction of aggravated assault while eluding a police officer (count seven) because the judge failed to give proper consideration to defendant's mental illness and substance abuse problem and the fact that he had led a law-abiding life for a number of years prior to the instant crimes. We disagree.

---

[8] Defendant does not contend that the State failed to present sufficient evidence to enable a jury to find beyond a reasonable doubt that he was guilty of second-degree armed burglary of the Garrett vehicle (count twenty-six).

Before defendant's sentencing, the prosecutor filed a motion for the imposition of an extended term on count seven because defendant qualified as a "persistent offender" under *N.J.S.A.* 2C:44–3a. After reviewing the information presented by the State in support of its motion, the judge found that defendant met the criteria of a persistent offender. This finding has ample support in the record and is not contested by defendant on appeal. Rather, defendant limits his argument to the contention that the judge abused his discretion in imposing an extended term.[9]

We are satisfied, after fully reviewing the record, that the judge did not abuse his discretion by imposing an extended term. Although defendant's prior convictions did not involve crimes of violence, they were similar to several of the instant offenses which involve property-related crimes. In light of this similarity, on three separate occasions, an extended term is in the best interest of the public to protect society from future similar offenses that defendant might commit. *Dunbar, supra,* 108 *N.J.* at 95–96, 527 *A.*2d 1346.

Defendant's argument that imposition of an extended term constituted an abuse of discretion because the judge failed to give proper consideration to his mental illness and substance abuse problem and the fact that he had led a law-abiding life for a number of years prior to the instant crimes is also without merit. *R.* 2:11–3(e)(2). Defendant's claim of mental illness did not warrant, under the facts, a reason not to impose an extended term. His law-abiding life was for a relatively short period, here, less than nine years.

## VII

Defendant contends in Point VI of his brief that the judge abused his discretion by imposing a sentence on his conviction of third-degree aggravated assault of Officer Bruno (count nine)

---

[9] *Defendant does not contest the length of the extended term imposed.*

which was consecutive to the sentence imposed on his conviction of third-degree aggravated assault while eluding Detective Hurley (count seven) and by imposing a sentence on his conviction of second-degree armed burglary (count twenty-two) which was consecutive to the sentence imposed on count nine. Defendant maintains that concurrent terms should have been imposed instead.[10] We disagree. *State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), permits consecutive sentences where separate crimes are committed at diverse times. We find no merit in defendant's claim. *R.* 2:11–3(e)(2).

Affirmed.

---

[10] Defendant does not contest the length of either the consecutive or concurrent terms imposed.