**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2860-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCUS K. PENDLETON,

    Defendant-Appellant.

_____

Submitted October 29, 2025 – Decided January 30, 2026

Before Judges Gummer and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-04-0877.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Maura M. Sullivan, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Marcus K. Pendleton appeals from a March 5, 2024 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. Based on our careful review of the record and the application of well-established law, we conclude defendant failed to establish a prima facie case of ineffective assistance of trial counsel and affirm.

We are familiar with this matter as we affirmed defendant's convictions and sentence on direct appeal. See State v. Pendleton, No. A-1137-17 (App. Div. Sept. 3, 2020), certif. denied, 246 N.J. 438 (2021). We recite the following from our prior opinion to provide procedural and factual context:

> Defendant and the victim started dating in 2013 and began living together in September 2014 in a second-floor apartment that defendant leased. At the time of the incident, according to the victim, defendant did not drink alcohol as he was a recovering alcoholic who attended Alcoholic Anonymous meetings and, for that reason, alcohol was not kept in the apartment. In fact, she never saw defendant drink alcohol at any time. On December 31, 2014, there was nothing about defendant that made the victim think defendant had been drinking.
>
> On that day, when the victim left for her 1:00 p.m. to 10:00 p.m. shift at work, she believed she had her apartment keys with her. After her shift ended, the victim went to a bar with coworkers to celebrate her recent promotion. The victim earlier informed defendant that she would be going out with her coworkers after her shift ended. Her failure to return

2

home after work upset defendant who was already concerned that the victim was not being faithful to him.

When the victim arrived back at home at approximately midnight, she realized she did not have her keys, so she started to knock on the door, and called defendant on her cell phone. Defendant never responded so the victim decided to lean against the door and sleep on the floor.

At approximately 5:00 a.m., the victim woke up when defendant opened the door. Defendant immediately started to yell at her and as she got up, defendant pulled at her jacket, attempted to push her over the staircase railing, pulled her into the apartment, slammed the door shut, sat on the victim, and started slapping her in the face with an open hand.

While defendant was slapping the victim, he stated "that this [was] all [the victim's] fault, that he [did not] want to do this, but [she] made him do this to [her]." Anytime the victim attempted to get free, defendant would sit on her chest harder, pin her arms back, or bend her legs so she could not move. She could not scream for help, as defendant also kept putting "his hand over [her] mouth." Defendant started to choke the victim, which caused her to pass out. After she woke up, defendant attempted to console the victim before resuming the beatings by punching her until he eventually got up, locked the front door, dragged the victim to their bedroom, and continued to beat her on the bed. The victim believed that defendant was going to kill her.

When the beatings suddenly ended, defendant told the victim to go to the bathroom, where he had opened the medicine cabinet so she could not see herself in the mirror. Defendant gave her a washcloth

3

to clean herself, and then he "cleaned up some of the blood that was . . . splattered everywhere." Defendant then grabbed the victim's personal belongings, including her cell phone, computer, credit cards, identification, and the bloody bed sheets on the bed. As he left for work, he told the victim that "it wouldn't be good for [her] to go to the police department or to the police."

When he was gone, the victim was listening for defendant's car to leave when he suddenly stormed back into the apartment and accused her of taking his cell phone. Defendant once again started slapping the victim but stopped when he realized his cell phone was in his pant pocket, which he was wearing at the time.

After defendant left for the second time, the victim waited for defendant to leave before she went to the police station that was across the street from the apartment. At the station, Officer Daniel Kinkler observed that the victim was bleeding onto the floor, and that her "face was extremely swollen, black and blue, [with] eyes swollen so much [he] could just see a slit. [He] couldn't make out the color of the eyes or anything like that," and because of how bad the injuries were, at first, Kinkler could not even determine if the victim was male or female. The officer radioed for ambulance assistance. Prior to its arrival, the victim informed the officer that defendant was the one that "did this to" her, and Kinkler photographed the victim's face.

After the ambulance left, Kinkler went to the apartment and was joined by then Patrol Sergeant Michael Scardino. There, the officers "noticed blood on a door jamb[,] . . . a little bit of blood on the floor," and that the bed sheets were not on the bed. While at the apartment, Kinkler also observed that there were no

4

bottles of alcohol. Before leaving, Scardino took photographs of the scene.

At the hospital, then Detective Sergeant Bruce Koch and prosecutor's Detective Jose Rosado interviewed the victim. The interview ended when the victim, who was feeling pain everywhere, got sick to her stomach and vomited up blood. The officers were able to obtain information about defendant's location.

A doctor at the hospital treated the victim for multiple contusions and bruises to the face. The victim did not experience any fractured bones. It was ultimately determined that she suffered from Post-Concussive Syndrome, headaches, had undergone six sessions of occupational therapy, and was being treated by a neurologist for chronic headaches.

In the meantime, after defendant left the apartment, and before going to work, he allegedly went to a friend's residence at approximately 5:30 a.m. The friend had known him for over twenty years and knew what he was like when he got drunk. According to the friend, defendant was drunk when she saw him as he was slurring his words, stumbling, and she could smell alcohol on him. She was concerned about defendant driving to work and working while intoxicated.

Later that day, Koch and Scardino arrested defendant at his place of employment.[*] Scardino read defendant his Miranda rights[**] and obtained permission from defendant to search defendant's vehicle, which resulted in the discovery of the bed sheets and the victim's personal items, but no bottles of alcohol.

At the police station, Kinkler processed defendant, and, based on his training, the officer

5

concluded defendant was not under the influence of alcohol at that time and that a blood alcohol test was not necessary. Scardino provided defendant with his Miranda rights and also concluded that he could not detect alcohol in defendant's system, although he did not know whether defendant was drinking the night before. Rosado stated that there was nothing to make him believe defendant had recently drank after the incident.

Koch and Rosado then interviewed defendant. The interview was recorded on video tape. According to Koch, defendant's speech was clear, and at no time did Koch think defendant was under the influence of alcohol. In the video statement, defendant stated that prior to December 31, 2014, he told the victim not to come back to the apartment because they had trust issues. According to defendant, the victim had been inappropriately talking to another man. The trust issues led the victim to install a tracking application on her cell phone so she could regain his trust.

Defendant stated that on December 31, 2014, the victim was supposed to come back to his apartment after work but because she went out with her friends, he told her not to come back. He stated that the situation was too much for him, which caused him to drink. Defendant stated, "that he had [drank] very heavily during the night before he came across [the victim] and that he had blacked out." According to defendant, because he had not consumed any alcohol for over a year and because he drank so much, he did not recall many of the things that took place when the victim returned home.

Nevertheless, defendant explained how the victim tried to force her way back into the apartment, he tried to get her back out, and he "panicked and . . .

6

tried to cover her face," which caused the victim to start hitting defendant. After looking at her phone and seeing that she deleted text messages, he "started hitting her in her face" with an open hand. He admitted to hitting her more than once and to tracking her on the cell phone application. Defendant stated that he hit the victim approximately eight times and he recalled the conversation they had while he was hitting her. He even recalled opening the medicine cabinet to prevent the victim from seeing her face start to swell and getting her a bag of french fries from the freezer to help with the swelling. Defendant further stated that he took the bed sheets with him to work "[b]ecause [he] knew how much it meant to her" since "she was really excited to get [it] as a gift." He also admitted to taking the victim's personal items but could not recall why he did that.

Defendant denied telling the victim not to go to the police but stated that he knew she was going to go to the police. He said he felt "shame for . . . hitting her," and "that it wasn't [his] intention to seriously hurt" the victim.

In the meantime, after leaving the hospital, the victim stayed with a friend until she returned to the apartment on January 2, 2015. When she returned, she did not notice any alcohol in the apartment.

A few days after her return, defendant, who had been ordered not to contact the victim, called the victim while he was in jail and told her not to talk to the police. The call was video and audio taped by corrections officers.

During the call, defendant asked the victim to "hear [him] out," the victim stated "[y]ou're not supposed to call me," defendant apologized for what he

did, and stated that he was "going to kill [himself]," and he could not live like this. Defendant started to state that "[i]t hurt [him] so bad when [he] found out" what the victim did to him and again reiterated that the victim "hurt [him] so bad." He asked the victim that "[i]f [he did not] talk to . . . anybody else again, just let everybody know that . . . [he] love[s] them." After the victim stated that she was going to press charges, defendant stated "[p]lease don't do that." He further stated "just please don't testify in court. Please just don't." Defendant indicated that he and his family could not "take this." Afterwards, the victim spoke to Koch about the phone call she received from defendant. Defendant was later charged with an additional offense relating to the call.

Thereafter, a Grand Jury returned an indictment charging defendant with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (Count 1); third-degree tampering with witness and informants, N.J.S.A. 2C:28-5(a) (Count 2); fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(a)(1) (Count 3); third-degree tampering with witnesses and informants, N.J.S.A. 2C:28-5(a)(1) (Count 4); and fourth-degree criminal contempt, N.J.S.A. 2C:29-9(b) (Count 5).[***]

Defendant's first trial ended in a mistrial on February 22, 2017.[****] The second trial began on May 2, 2017. . . . The jury convicted defendant of Counts 1 through 4. The State moved to dismiss Count 5, which the court granted. On July 21, 2017, the trial court granted the State's motion for sentencing in the extended term, and then imposed an aggregate sentence of twenty-four years, subject to a parole ineligibility period under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

_____

8

[*]   On the same day, a municipal court entered a temporary restraining order under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-27 to -35, barring defendant from having any contact with the victim.

[**]  Miranda v. Arizona, 384 U.S. 436 (1986).

[***]  Counts 1 to 3 related to the events of December 31, 2014, while Counts 4 to 5 related to the phone call defendant made to the victim on January 6, 2015.

[****]  As the trial court found at the time, the mistrial was required after Koch mistakenly mentioned the domestic violence restraining order in response to a question on direct examination that did not call for its disclosure.

[Pendleton, slip op. at 8-16 (all alterations in original except reformatted footnotes).]

Defendant filed his petition for PCR.  As relevant here, he argued trial counsel was ineffective regarding his "diminished capacity" defense.  In this respect, he relied on the opinion of his expert witness, Dr. Peter Oropeza, a forensic psychologist, asserting that "it was the combination of an untreated bi-polar condition and severe alcohol intoxication that led to [Oropeza's] opinion that there wasn't knowing or purposeful conduct, purposeful attempt to cause severe bodily injury."  He contended that, despite this "sole defense," trial counsel had

failed to investigate, consult with or use an expert such as a toxicologist that could explain the very difficult concept of intoxication to the jury, and who could have challenged the testimony in this case by the police officers that undermined the diminished capacity defense.

. . . .

Trial counsel failed to challenge or object in any way to the harmful testimony by the police officers. Counsel also failed to investigate additional evidence of [defendant]'s intoxication, most notably [his] mother, who as we know, was prohibited from testifying at trial because of a violation of the . . . sequestration order, which was also attributable to trial counsel's failure to investigat[e] and was ineffective assistance of counsel.

In addition, defendant contended trial counsel was ineffective for "fail[ing] to file a motion to suppress the warrant[]less search of his apartment, which also led to harmful testimony by the police officers that th[e] search of the apartment revealed no evidence that . . . [defendant] had been drinking."

Further, defendant argued his PCR expert, Dr. Lawrence Guzzardi, a toxicologist, opined that trial counsel "failed to provide sufficient information to the jury about [defendant]'s inability to consciously understand his actions in his moment of passion, without control and alcohol intoxication."

In an oral decision, the PCR court considered defendant's arguments that he had been provided with ineffective assistance of trial counsel regarding: (1)

10

counsel's "refus[al] to object to testimony that . . . [he] did not appear intoxicated"; (2) "testimony concerning signs of intoxication"; and (3) "the affirmative defense of diminished capacity."

As to trial counsel's refusal to object, the PCR court held that "officers . . . would be able to testify as to their . . . perception . . . they saw [defendant] within hours of the alleged assault [and] that he was not intoxicated," citing State v. Bealor, 187 N.J. 574 (2006) and N.J.R.E. 701, which provides "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:  (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue."  The PCR court found no "defense counsel error." The court also stated introducing his intoxication to the jury would "not [have been] a positive thing for [defendant]."

Regarding the "signs of intoxication," the court concluded the State was not required to submit "expert opinion[s]" from the officers to show "non[-]intoxication."  The court found the "lack of objection" did not "fall[] below the standard of" Strickland v. Washington, 466 U.S. 668 (1984).  The court noted "when we get into trial strategy, and . . . the heat of that particular

A-2860-23

moment," there was not "anything that the defense attorney had done incorrectly."

As to the diminished capacity defense, the court found it was "weakly supported" and a "highly unlikely and implausible defense." Applying the Strickland standard, the court determined "defense counsel did the best he . . . could with both [of] the experts[,] . . . the evidence against defendant, and defendant's own statement." The court considered Guzzardi's report as "a little bit of Monday morning quarter[]backing." The court concluded there was not "enough to meet both prongs of Strickland." The court found there was a "disagreement in strategy" and, referencing our opinion on direct appeal, the "proof against . . . defendant was overwhelming." The PCR court exercised its "discretion under [R]ule 3:22-10," and concluded that no evidentiary hearing was required.

On appeal, defendant presents the following arguments for our consideration:

> POINT I - DEFENDANT WAS ENTITLED TO AN EVIDENTIARY HEARING WHERE HE ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL.
>
> (A) Trial counsel failed to retain an expert to challenge the police officers' testimony concerning the effects of alcohol and

12

whether defendant was intoxicated at the time of the assault.

(B) Trial Counsel Was Ineffective For Failing to Challenge Prosecutorial Misconduct.

(C) Trial Counsel Was Ineffective Pursuant to Lafler v. Cooper, 566 U.S. 156 (2012).

(D) Trial Counsel Was Ineffective for Failing to Challenge the Warrantless Search of Defendant's Apartment.

(E) Defense Counsel Failed to Specify That the Intoxication Instruction Was Part of the Diminished Capacity Charge.

(F) Defense Counsel Failed to Object to the Composition of the Verdict Sheets and Its Failure To Include Factors Relevant to Sentencing.

(G) Defense Counsel Failed to Object to the Court's Failure to Charge the Jury with Causation.

(H) Defense Counsel Failed to Object to the Court's Failure to Charge the Jury With Use of Force in Self Protection And Use of Force in Defense of Premises or Personal Property.

[(Capitalization Modified).]

When the PCR court does not hold an evidentiary hearing, it "is within our appellate authority" "to conduct a de novo review of both the factual findings

and legal conclusions of the PCR court." State v. Harris, 181 N.J. 391, 421 (2004); see also State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020) ("We review [a PCR court's] legal and factual determinations de novo" when it did not conduct an evidentiary hearing.). We add "there are no issues that turn on credibility," Harris, 181 N.J. at 421, and our opinion on direct appeal provided an extensive review of the trial record.

PCR "is New Jersey's analogue to the federal writ of habeas corpus." State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)). It "provide[s] a built-in 'safeguard that ensures that a defendant [i]s not unjustly convicted.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)).

"A petition for [PCR] is cognizable if based upon . . . [a s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey[.]" R. 3:22-2(a). "Those accused in criminal proceedings are guaranteed the right to counsel to assist in their defense." State v. Gideon, 244 N.J. 538, 549 (2021) (citing U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). "[I]t is not enough '[t]hat a person who happens to be a lawyer is present at trial alongside the accused,' . . . rather, the right to counsel has been interpreted by the United States Supreme

14

Court and [the New Jersey Supreme] Court as 'the right to the effective assistance of counsel.'" Id. at 550 (second alteration in original) (quoting Strickland, 466 U.S. at 685-86).

To establish a prima facie case of ineffective assistance of counsel, a defendant must satisfy the two-prong test established in Strickland. See also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-prong test in New Jersey). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[1] Strickland, 466 U.S. at 687. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

---

[1] The Sixth Amendment to the Constitution of the United States provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Under "the 'second and far more difficult prong,'" a defendant must show that his or her defense was prejudiced. Gideon, 244 N.J. at 550 (quoting Preciose, 129 N.J. at 463). The defendant must demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. "Prejudice is not to be presumed." Gideon, 244 N.J. at 551. "The defendant must 'affirmatively prove prejudice.'" Ibid. (quoting Strickland, 466 U.S. at 693).

If defendant fails to "make[] both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

A defendant "must establish the right to [PCR] by a preponderance of the credible evidence." Preciose, 129 N.J. at 459 (citing State v. Mitchell, 126 N.J. 565, 579 (1992)). "R[ule] 3:22-1 does not require evidentiary hearings to be held on [PCR] petitions [and] R[ule] 3:22-10 recognizes judicial discretion to conduct such hearings." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). Nevertheless, PCR "courts ordinarily should grant evidentiary

16

hearings to resolve ineffective-assistance-of-counsel claims if a defendant has presented a prima facie claim in support of" PCR. Preciose, 129 N.J. at 462. "[C]ourts should view the facts in the light most favorable to a defendant to determine whether a defendant has established a prima facie claim." Id. at 462-63. "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim . . . will ultimately succeed on the merits.'" State v. Porter, 216 N.J. 343, 355 (2013) (quoting R. 3:22-10(b)). A defendant "must do more than make bald assertions that he was denied the effective assistance of counsel." Cummings, 321 N.J. Super. at 170. Applying this well-established law, we consider each of defendant's arguments.

1. Toxicology Expert

Defendant contends trial counsel's representation was deficient because counsel failed to "retain a toxicology expert who could testify and challenge the police officers' opinion about the effects of alcohol and about whether defendant showed signs of drinking at the time shortly after the incident." While acknowledging that "trial counsel utilized . . . Oropeza at trial to testify that . . . defendant was suffering from diminished capacity at the time of the offense," defendant argues trial counsel "failed to investigate an expert who was qualified to challenge the police officers' harmful testimony about typical effects of

17

drinking and the lack of intoxication on the part of defendant, which undermined . . . Oropeza's testimony and opinions."  Moreover, defendant contends "[t]rial counsel should have consulted a toxicologist to support the defense at trial and defendant's claims that he drank so much alcohol that he passed out that night."

Defendant retained Guzzardi to support his petition for PCR.  Defendant asserts Guzzardi opined he "'was under the influence of alcohol at the time of the incident to the extent that he was unable to make conscious decisions to do harm, and that alcohol adversely affected his ability to obtain a true understanding of his actions and to provide insight into his lack of control.'"  Moreover, "Guzzardi opined that 'the lack of testimony regarding the effects of significant alcohol intoxication on an individual such as [defendant] was significant in'" the trial.  Defendant contends "Guzzardi's expert opinion demonstrates how failing to present such evidence at trial prejudiced" him.

In our opinion on defendant's direct appeal, we stated:

> [W]e consider defendant's arguments in . . . his merits brief about the limitations imposed by the trial court on the scope of his expert's, . . . Oropeza, testimony at trial. Prior to trial, the court conducted a Rule 104 hearing to determine the extent of Oropeza's testimony.  Oropeza, a forensic psychologist, testified that he was asked to conduct a psychological evaluation of defendant in 2016.  Based on his evaluation, Oropeza concluded that defendant suffered from a bipolar disorder.

18

After reviewing defendant's personal history dating back to the 1990s, Oropeza opined that defendant had "a longstanding history of . . . untreated mental illness[ and] very poor coping skills." He testified defendant "was not able to knowingly and purposefully act out" on December 31, 2014 "due to a combination of his mental illness and his . . . substance abuse, including alcohol." In reaching that conclusion, Oropeza relied upon defendant telling him that "he drank approximately half a gallon of vodka" on December 31, 2014, up until the point that he passed out, which prevented defendant from recalling what happened.

On cross-examination, Oropeza, acknowledged that he did not "review anything with regard to [defendant's] blood alcohol content," but instead relied upon what defendant had told him in the evaluation and the statement defendant gave to the police. The doctor could not determine whether defendant acted recklessly, as he was not asked to make that determination. While the doctor conceded that his report never opined about whether defendant purposely or knowingly removed all of the victim's items from the apartment, removed the sheets, and cleaned off the blood from the apartment, he testified that "[i]t sounds like he[ knew] what he[ was] doing in reference to that."

The trial court found Oropeza to be credible, and "by the thinnest of . . . testimony," the court "permit[ted] the doctor to testify as to the diminished capacity defense, that there [was] a mental disease or defect that may negate the mental state that is an element of the offense." The court would however, "not permit[] testimony as to [defendant's] alcohol consumption [on the night of the incident] absent an[y] support." The court permitted Oropeza to testify that "defendant could not knowing[ly], purposely or was not

19

able to form . . . the requisite intent due to his mental illness."

At trial, Oropeza again testified to the information and opinions he discussed at the Rule 104 hearing, including his statements about defendant's history of alcohol abuse. He also explained in preparing his report that he spoke to defendant and defendant's mother, he reviewed defendant's psychiatrist's opinions, and that "[a]t the time of the offenses," defendant had an "untreated" "bi[]polar disorder" and "[a]n alcohol dependency problem." In his professional opinion, defendant could "not knowingly and purposely attempt to cause serious bodily injury."

On cross-examination, Oropeza again stated that defendant told him that he had "ingested an approximate level of a half gallon of vodka" on December 31, 2014. He also stated that while he was asked to opine on whether defendant's "mental issues or his alcohol intake effected his ability to act purposely or knowingly," he was never asked to prepare a report about whether defendant acted recklessly. Oropeza explained that it was the "combination of an untreated bi[]polar condition and . . . severe alcohol intoxication [that led] to [his] opinion that there wasn't knowing or purposeful attempts to cause severe bodily injury."

On appeal, defendant argues that the trial court should not have prevented defendant's "expert from testifying that intoxication was part of the foundation for his medical opinion," "[e]ven with [the] court finding that intoxication should not be charged." By only allowing Oropeza to testify about defendant's bipolar disorder, and not to testify about defendant's "prior alcohol dependenc[y], his addiction to alcohol and his intoxication [on] that night" of the incident, did

20

not allow the jury to fully understand "the true nature of [Oropeza's] expert opinion" and his diminished capacity.

We conclude that the premise of defendant's argument about Oropeza is simply incorrect. Here, the trial court permitted Oropeza to testify about how defendant's history of mental disorder and substance abuse could have impacted defendant on the night of the incident. Even though the witness had been previously barred from testifying that defendant drank on the night of the incident, the doctor told the jury what defendant had told him about the amount of alcohol he consumed that night. The trial court specifically stated that unlike determining whether defendant's "faculties were [so] prostrated" to warrant the intoxication defense charge, the lack of proof of intoxication was not a bar to Oropeza testifying about the effects of defendant's alcoholism and mental disorder. For that reason, Oropeza was permitted to testify about defendant's allegation that he consumed alcohol and how defendant's psychological and substance abuse issues prevented defendant from purposely or knowingly committing an aggravated assault. Contrary to defendant's contention, the trial court did not impede the doctor's testimony or defendant's defense and later it appropriately charged the jury with diminished capacity. . . .

[Pendleton, slip op. at 22-25 (all but first alteration in original).]

Given our previous observations that the trial court permitted Oropeza to testify as to "how defendant's history of mental disorder and substance abuse could have impacted defendant on the night of the incident," "the lack of proof

21

of intoxication [did] not . . . bar . . . Oropeza [from] testifying about the effects of defendant's alcoholism and mental disorder," and "Oropeza was permitted to testify about defendant's allegation that he consumed alcohol and how defendant's psychological and substance abuse issues prevented defendant from purposely or knowingly committing an aggravated assault," we conclude defendant failed to establish, prima facie, that trial counsel's representation was deficient for failing to retain a toxicologist. Id. at 25. Indeed, given the extent of Oropeza's testimony, defendant does not meaningfully explain what a toxicologist would have added to Oropeza's testimony. Further, considering Oropeza's testimony, defendant fails to establish how his defense was prejudiced. The PCR court did not abuse its discretion in denying an evidentiary hearing on this basis.

2. Prosecutorial Misconduct

Defendant argues trial counsel's representation was deficient because trial counsel failed to object to what he purports was prosecutorial misconduct during the prosecutor's summation. Defendant contends the prosecutor permissibly "argued in closing that . . . defendant was not intoxicated" but "far exceeded the bounds" of permissibility in "characteriz[ing] the defense as preposterous, purely fabricated, made up, and manipulative" and referring "to . . . Oropeza as

22

a paid expert." Further, defendant argues trial counsel's deficiency in this respect prejudiced him because the prosecutor's "closing argument . . . certainly had the effect of denying him the right to a fair trial."

The State argues defendant's claim of prosecutorial misconduct is barred under Rule 3:22-4(a), which provides:

> Any ground for relief not raised in the proceedings resulting in the conviction . . . or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds:
>
> > (1) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or
> >
> > (2) that enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice; . . .
>
> . . . .
>
> A ground could not reasonably have been raised in a prior proceeding only if defendant shows that the factual predicate for that ground could not have been discovered earlier through the exercise of reasonable diligence.
>
> [R. 3:22-4(a).]

Although we discern no reason why defendant did not raise prosecutorial misconduct on direct appeal, or why this argument, consequently, is not subject

to Rule 3:22-4(a)'s bar, we consider the argument for the sake of completeness. "When an appellate court reviews a claim of prosecutorial misconduct with respect to remarks in summation, the issue presented is one of law. . . . [O]ur review is plenary and de novo." State v. Smith, 212 N.J. 365, 387 (2012).

"It is axiomatic that '[t]he duty of the prosecutor is as much . . . to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" State v. Supreme Life, 473 N.J. Super. 165, 171-72 (App. Div. 2022) (alteration in original) (quoting State v. Williams, 244 N.J. 592, 607 (2021)) (internal quotation marks omitted). Therefore, "[w]hile 'prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are 'afforded considerable leeway,' 'their comments [should be] reasonably related to the scope of the evidence presented.'" Id. at 172 (second alteration in original) (quoting Williams, 244 N.J. at 607) (internal quotation marks omitted). "It is . . . improper for a prosecutor to use derogatory epithets to describe a defendant." Id. at 174. Use of words like "'coward,' 'liar,' or 'jackal' [are] . . . derogatory . . . [and] are especially egregious when . . . the prosecutor pursues a persistent pattern of misconduct throughout the trial." Ibid. (quoting State v. Wakefield, 190 N.J. 397, 466-67 (2007)) (internal quotation marks omitted).

However, "even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." Id. at 172 (quoting State v. McNeil-Thomas, 238 N.J. 256, 275 (2019)). Instead, "we weigh the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial[.]" Ibid. (quoting McNeil-Thomas, 238 N.J. at 275) (internal quotation marks omitted).

Our task is to "take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Ibid. (quoting Williams, 244 N.J. at 608) (internal quotation marks omitted). "[T]here must have been 'some degree of possibility that [the prosecutor's comments] led to an unjust result.'" Ibid. (second alteration in original) (quoting McNeil-Thomas, 238 N.J. at 276) (internal quotation marks omitted).

Applying this standard, we conclude the prosecutor's summation did not rise to the level of prosecutorial misconduct. There was nothing egregious or inflammatory in the comments, and the comments were tethered to the evidence. Further, defendant failed to demonstrate he had not been provided with a fair trial or the prosecutor's summation led to an unjust result.

Because we conclude there was no prosecutorial misconduct, we similarly conclude defense counsel's representation was not deficient in not lodging an objection during the prosecutors' summation. "We [have] recognize[d] the general reluctance of counsel to object during a summation." State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997). Additionally, the Court has noted "[g]enerally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." State v. R.B., 183 N.J. 308, 333 (2005) (quoting State v. Frost, 158 N.J. 76, 82-84 (1999)); see also Bauman, 298 N.J. Super. at 207 (quoting State v. Wilson, 57 N.J. 39, 51 (1970) ("A failure to make a timely objection to a prosecutor's remarks, shows that 'in the atmosphere of the trial the defense did not believe that the prosecutor's remarks were prejudicial.'")). These considerations suggest trial strategy, see Strickland, 466 U.S. at 689, not deficient performance or prejudice. There was no abuse of the PCR court's discretion in denying an evidentiary hearing on this basis.

3.  Lafler v. Cooper

Defendant argues trial counsel's representation was deficient because counsel failed to investigate and review the State's purported plea offer of "five

years with a three-year parole disqualifier."  He contends the deficient representation led him to a trial of this matter, when he would have accepted the State's offer and served less time.

In Lafler, the United States Supreme Court held "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process."  566 U.S. at 162.  Therefore, "[d]uring plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'"  Ibid. (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)); see also State v. DiFrisco, 137 N.J. 434, 456 (1994) (applying "the Strickland test to challenges of guilty pleas based on ineffective assistance of counsel").

The Court stated "the two[-]part Strickland . . . test applies to challenges to guilty pleas based on ineffective assistance of counsel."  Lafler, 566 U.S. at 162-63 (quoting Hill v. Lockhart, 474 U.S. 52, 58 (1985)).  "The performance prong of Strickland requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'"  Id. at 163 (quoting Hill, 474 U.S. at 57) (internal quotation marks omitted).

In New Jersey, "a defendant considering whether or not to plead guilty to an offense [must] receive[] correct information concerning all of the relevant material consequences that flow from such a plea."  State v. Agathis, 424 N.J.

27

Super. 16, 22 (App. Div. 2012) (citing State v. Nuñez-Valdéz, 200 N.J. 129, 138 (2009)).

In Lafler, the question was "how to apply Strickland's prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial." 566 U.S. at 163. The Court held:

> To establish Strickland prejudice a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.
>
> [Ibid. (citation reformatted).]

When a defendant alleges counsel's ineffective advice led to an offer's rejection,"[h]aving to stand trial, not choosing to waive it, is the prejudice alleged." Id. at 163-64. Under

> these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

A-2860-23

[<u>Id.</u> at 164.]

In support of his PCR petition, defendant stated:

> Prior to my first trial, my trial attorney told me about a plea offer for five years with a three-year parole disqualifier. He did not give me any advice in connection with this offer and simply asked me, "what are you going to do?" The only other thing he told me in connection with the plea offer was that I had to make the decision myself. I had asked my mom about the offer, and I told her that I did not know what to do. My trial attorney also never advised me about the advantages or disadvantages of going to trial v[ers]us[] taking the plea deal or any plea deal. In general, my attorney did not communicate much with me. I would have taken the plea offer if my attorney had advised me to take the plea offer.

> [(Emphasis omitted).]

During the PCR hearing, PCR counsel advised the court that the State had denied the offer "happen[ed]." In addition, counsel stated the record did not contain any pretrial conferences concerning the plea offer. Nevertheless, on appeal, defendant argues trial counsel's representation was deficient because he "failed to familiarize himself with the defendant's criminal history and had he done that, he would have known that his client was exposed to the extended-term sentence and advised him to accept the plea offer" and "based upon the trial strategy of reduced culpability, that the best he could hope for

29

would be the sentence made in the plea offer."  Moreover, he also contends that he "is serving a very lengthy sentence" because of the trial counsel's failures.

The State argues "defendant's claim must fail because he failed to provide any evidence to support his claim, other than his self-serving statements."  In addition, the State contends "defendant failed to provide any details as to the terms of the alleged plea offer, such as the charge that he would have pled guilty to in exchange for a five-year term."  Moreover, the State noted it "had submitted defendant's pretrial memorandum to the PCR trial court, which indicated a plea offer of fourteen years with an 85% period of parole ineligibility, consecutive to a five-year flat term to the witness tampering charge."

We conclude defendant failed to establish a prima facie case of ineffective assistance of trial counsel under Lafler.  Defendant failed to produce any evidence that the State offered a "plea offer for five years with a three-year parole disqualifier."  In fact, the only evidence in the record concerning a plea offer was the State's pretrial memorandum that described a plea offer exposing defendant to substantially more time.  Because defendant did not establish, prima facie, an offer as he described was ever made, he similarly cannot establish defense counsel's representation in that respect was deficient or

prejudicial. The PCR court did not abuse its discretion in denying an evidentiary hearing on this basis.

### 4. Warrantless Search

On direct appeal, defendant argued "he was provided the ineffective assistance of counsel . . . because his attorney never sufficiently challenged . . . the illegal search of [his] apartment." Pendleton, slip op. at 57. We concluded "that the claim[] defendant raise[d was] . . . better left to a petition for . . . PCR." Ibid.

Defendant argues the PCR court's finding that "no alcohol-related items were observed in the apartment" "misse[d] the point of the argument" because "defendant was prejudiced not by what was discovered in the apartment but by the observations of the police officers who illegally entered the apartment and their testimony as to what they did or did not observe." Defendant contends the victim "did not have authority to consent to a search of [his] apartment" and a motion to suppress would have successfully "suppress[ed] the harmful testimony that resulted from the search."

As to the harmful testimony, defendant notes "Kinkler testified that a search of [his] apartment showed that there was no evidence of defendant

drinking." Defendant argues the "testimony undermined [his] diminished capacity defense."

In our opinion on defendant's direct appeal, we found:

> [T]he victim testified that she had never seen defendant drink alcohol and when he attacked her, she did not sense an odor of alcohol, or observe any bottles or anything else to indicate that defendant was under the influence at that time. Moreover, the search of defendant's apartment and car did not yield any evidence of alcohol consumption. Other than defendant and his friend, every witness "who observed him . . . before [and after] the crime testified that he did not appear to be intoxicated and defendant's [recorded statement to police] showed a clear and detailed recollection as to the events." State v. Zola, 112 N.J. 384, 425 (1988). In defendant's detailed statement, he not only admitted to hitting the victim, but he also described how he hit the victim, where he hit the victim, what he did to clean the apartment, and what he did when he left the apartment. The only evidence of defendant's intoxication was his statement to police and his friend's observations, neither of which demonstrated a prostration of defendant's faculties.
>
> [Pendleton, slip op. at 20-21 (all but first alteration in original) (citation reformatted).]

Considering our earlier opinion, we conclude, even if counsel was deficient in failing to file the motion to suppress, and the motion would have successfully suppressed Kinkler's testimony that he did not observe any evidence of defendant's use of alcohol in the apartment, defendant fails to

32

establish he was prejudiced under the second <u>Strickland</u> prong. At worst, Kinkler's testimony was cumulative to the victim's and other witnesses' testimony and defendant's clear and detailed statement to the police. Under these circumstances, there was no prejudice and no abuse of discretion in denying an evidentiary hearing on counsel's failure to file a motion to suppress.

5. <u>Intoxication Instruction Was Part of the Diminished Capacity Charge</u>

Defendant argues trial counsel's representation was deficient because "counsel failed to explain that the hybrid defense of diminished capacity/intoxication was based on both the intoxication statute and the diminished capacity statute," citing N.J.S.A. 2C:2-8[2] and N.J.S.A. 2C:4-2.[3]

---

[2] N.J.S.A. 2C:2-8(d) provides:

> Intoxication which . . . is pathological is an affirmative defense if by reason of such intoxication the actor at the time of his conduct did not know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Intoxication under this subsection must be proved by clear and convincing evidence.

[3] N.J.S.A. 2C:4-2 provides:

> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of

Further, defendant contends counsel's "failure to argue that the intoxication instruction was an essential part of the hybrid diminished capacity charge clearly prejudiced [him] at trial."

In our opinion on defendant's direct appeal, we held "the trial court correctly denied defendant's request to charge the intoxication defense because there was insufficient evidence to support the request." Pendleton, slip op. at 21. Indeed, we concluded "[t]he only evidence of defendant's intoxication was his statement to police and his friend's observations, neither of which demonstrated a prostration of defendant's faculties." Id. at 21-22.

Given our prior opinion on this issue, we conclude defendant did not establish, prima facie, that counsel's performance was deficient in failing to explain "the hybrid defense." Instead, the evidence was insufficient to warrant an intoxication charge. Nevertheless, counsel argued for the charge, which was denied. Further, because there was no deficiency, there was no prejudice. The PCR court did not abuse its discretion in denying an evidentiary hearing on this issue.

---

such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.

34

## 6. Verdict Sheets and Sentencing Factors

Defendant contends trial counsel's representation was deficient because counsel failed to raise issues regarding the verdict sheet. He argues:

> The verdict sheet failed to include the "factual predicate for an enhanced sentence or the existence of a fact relevant to sentencing," pursuant to R[ule] 3:19-l(b) (". . . The written verdict sheet shall include the factual predicate for an enhanced sentence or the existence of a fact relevant to sentencing unless that factual predicate or fact is an element of the offense.") Specifically, the defendant's prior record, the possible sentencing exposure for each offense, the fact that the defendant was eligible for an extended term of imprisonment pursuant to N.J.S.A. 2C:44-3 and that the State intended on pursuing the extended term of imprisonment for the defendant are all factors relevant to sentencing that should have been included on the verdict sheets but were not.

Defendant argues he was prejudiced because the omitted information "left the jurors unable to consider any factors relevant to sentencing during their deliberations." Moreover, the jurors "very well may have chosen to find him guilty of different/lesser offenses that they believed fit punishments with their respective crimes."

In our opinion on defendant's direct appeal, we noted that defendant's arguments challenging "numerous errors in the verdict sheet," Pendleton, slip op. at 57, was "never raised before the trial court." Id. at 36. Therefore, we

considered the argument under the "plain error" standard.  Ibid.  "Applying that standard, we conclude[d] defendant's claims" were "without sufficient merit to warrant discussion in a written opinion.  R[ule] 2:11-3(e)(2)."  Id. at 37.

As to whether defendant was provided with ineffective counsel regarding the verdict sheet, "[w]e conclude[d] that defendant['s] . . . argument[s we]re better left to a petition for" PCR.  Id. at 57.

The United States Supreme Court has noted "[t]he Fifth and Sixth Amendments placed the jury at the heart of our criminal justice system."[4] Erlinger v. United States, 602 U.S. 821, 831 (2024).  "Equally, the Fifth and Sixth Amendments sought to ensure that a judge's power to punish would 'deriv[e] wholly' from, and remain always 'control[led]' by, the jury and its verdict."  Ibid. (alterations in original) (quoting Blakely v. Washington, 542 U.S. 296, 306 (2004)).  Therefore, "[b]y requiring a unanimous jury to find every fact essential to an offender's punishment, those amendments similarly seek to constrain the Judicial Branch, ensuring that the punishments courts issue are not

---

[4]  In part, the Fifth Amendment to the Constitution of the United States provides: "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. V.

A-2860-23

the result of a judicial 'inquisition,'" id. at 832 (quoting Blakely, 542 U.S. at 307), and instead, "are premised on laws adopted by the people's elected representatives and facts found by members of the community." Ibid. Therefore, "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'" Id. at 833 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)) (internal quotation marks omitted).

In State v. Carlton, we held that under Erlinger, "a jury—not a sentencing judge—must decide whether prior convictions used to establish the basis for enhanced sentencing had been committed on separate occasions." 480 N.J. Super. 311, 316 (App. Div. 2024). In addition, we recognized "Erlinger . . . necessitate[d] a significant change to New Jersey practices and procedures for imposing a persistent-offender extended term of imprisonment under N.J.S.A. 2C:44-3(a)." Id. at 317. Therefore, Erlinger abrogated State v. Pierce, 188 N.J. 155 (2006), where our "Court [had] held that a sentencing court 'does not engage in impermissible fact-finding when it assesses a prior record of convictions and determines that a defendant is statutorily eligible for a discretionary extended-term as a persistent offender.'" Id. at 325 (quoting Pierce, 188 N.J. at 158).

We required that Erlinger receive "retroactive application" to "pipeline case[s]." Id. at 337. We stated "pipeline retroactive application [included] . . . cases where a direct appeal ha[d] not yet been decided." Id. at 338 n.16.

We conclude, applying the Erlinger/Carlton framework, defendant's argument regarding the verdict sheet has no merit. Defendant was sentenced on July 21, 2017, his direct appeal was decided September 3, 2020, and his petition for certification was denied by the New Jersey Supreme Court on June 4, 2021. Defendant's matter was not a pipeline case, because Erlinger was decided June 21, 2024, and we decided Carlton on December 19, 2024.

Therefore, counsel's representation was not deficient because Pierce was still controlling law at the time of trial and sentencing. Additionally, counsel argued against the extended term during the sentencing hearing. The PCR court did not abuse its discretion in denying an evidentiary hearing on this issue.

7. Other Jury Charges (Causation; Self-Protection; Defense of Premises & Personal Property)

Defendant argues trial counsel's representation was deficient because counsel did not object to the trial court's failure to charge the jury regarding causation. He contends this failure "prevented the jury from understanding and determining how a defendant's actions were required to be linked to the injuries sustained by a victim for him to be found guilty."

38

Defendant contends "[t]he victim's neurology report, which the victim was questioned about during trial, indicated that the victim's migraines/headaches were quite possibly rebound headaches attributed to her 'overuse of Aleve as an abortive agent.'" Further, he contends "[a]ny competent defense counsel would have used this information as a pretext to have a causation instruction charged to the jury with the primary mission of relieving the defendant of criminal responsibility due to the victim's actions." Defendant argues he "suffered significant prejudice that may have changed the outcome of the trial."

In addition, defendant contends "[t]he alleged assault upon the victim took place while [he] was defending himself from an assault initiated by the victim." In addition, "the events that led to the alleged assault upon the victim all transpired within an apartment/dwelling that was exclusively leased and occupied by the defendant." Therefore, defendant argues "[t]here is clear and apparent information that indicates that . . . defendant was engaging in self-protection and/or defense of premises, yet defense counsel failed to advance these charges be read to the jury to instruct them that these were possible defenses to . . . defendant's actions." Defendant contends counsel's failures "may have drastically affected the outcome of the trial."

The State argues defendant's claims, regarding jury instructions, are barred under Rule 3:22-5. The Rule provides: "A prior adjudication upon the merits of any ground for relief is conclusive whe[n] made in . . . any appeal taken from such proceedings."

In our opinion on defendant's direct appeal, we considered defendant's contentions "that the trial court failed to 'sua sponte charge the jury with causation with respect to' how the victim acquired her migraines and headaches because the jury may have found that the victim caused her own injuries." Pendleton, slip op. at 29. Moreover, we considered defendant's arguments that "the trial court should have instructed the jury on self-protection, N.J.S.A. 2C:3-4(a) and use of force in defense of premises and personal property, N.J.S.A. 2C:3-6(a)." Ibid.

"[W]e conclude[d] defendant's contentions [we]re without any merit." Ibid. We found "no request was ever made for these charges and defendant did not interpose an objection to the court's charge as delivered." Ibid. We concluded:

> "A claim of deficiency in a jury charge to which no objection is interposed 'will not be considered unless it qualifies as plain error . . . .'" R.B., 183 N.J. at 321 (quoting State v. Hock, 54 N.J. 526, 538 (1969)). "[V]iew[ing] . . . the totality of the entire charge, not in isolation," State v. Chapland, 187 N.J. 275, 289 (2006),

A-2860-23

we find no prejudicial error, <u>State v. Coruzzi</u>, 189 N.J. Super. 273, 312 (App. Div. 1983), or anything in the record to warrant that any of the cited charges be given to the jury.

[<u>Id.</u> at 29-30. (alterations in original) (citations reformatted).]

Therefore, without deciding whether counsel's representation was deficient regarding the jury charges, we conclude defendant fails to satisfy the "far more difficult" second <u>Strickland</u> prong. <u>Gideon</u>, 244 N.J. at 550. There is no evidence defendant's defense was prejudiced, that he was "deprive[d] . . . of a fair trial" or its result was not "reliable." <u>Strickland</u>, 466 U.S. at 687.

To the extent we have not addressed any of defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-2860-23